501 F.2d 1196
 2 O.S.H. Cas.(BNA) 1109, 1974-1975 O.S.H.D. ( 18,454
 Peter J. BRENNAN, Secretary, United States Department of
Labor, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and
Republic Creosoting Company, Division of Reilly
Tar & Chemical Corporation, Respondents.
 No. 73-1304.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 11, 1974.
Decided Aug. 16, 1974.
 
 Walter H. Fleischer and Karen K. Siegel, Attys., Dept. of Justice, Washington, D.C., for petitioner.
 Carl T. Reis, Indianapolis, Ind., for respondents.
 Before SWYGERT, Chief Judge, and PELL and STEVENS, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 The Secretary of Labor appeals from a decision of the Occupational Safety and Health Review Commission,[1] which found that the respondent Republic Creosoting Company had not committed any violations of the Occupational Safety and Health Act, 29 U.S.C. 651. The underlying facts are not in dispute on appeal, these facts being either stipulated by the parties or testified to at the hearing before the administrative law judge.
 
 
 2
 Republic Creosoting Company (Republic), a division of Reilly Tar and Chemical Corporation, operated five railroad tie marshalling yards in southern Indiana, including one in Jeffersonville, Indiana. Despite its name, Republic did not at the Jeffersonville yard engage in the creosoting process but it did, upon the acquisition of newly cut or 'green' ties, undertake the first step of seasoning or drying the wood for its eventual use. Republic ultimately resold the ties to railroad companies. These ties weighed approximately 150 to 235 pounds each.
 
 
 3
 The truckloads of ties arriving at the Jeffersonville yard were secured by chains to the transporting trucks. In twenty to twenty-five percent of the truckloads, the ties were bound together into packages, with each package held together by a single narrow steel band. Each package contained 25 to 45 ties, five ties high, five to nine ties across and one tie in length. The packaged ties were loaded lengthwise along the length of the truck, generally one package high and two packages across.
 
 
 4
 Republic unloaded the truckloads of banded ties in the following manner. The truckdriver ordinarily removed the chains holding the packages of ties onto the truck. The unloader operator (an employee of Republic) then moved the unloader (a forklift truck) into position so that it supported a package of banded ties. Only after the unloader was supporting a package, did the truckdriver, standing on an adjacent package, cut the band on the package to be unloaded. Under no circumstances would the band be cut before the unloader was in position. The unloader then removed the loosened ties from the truck. This process was repeated package by package until the truck was completely unloaded. During the entire operation, all Republic employees, other than the unloader operator, remained a safe distance from the truck.
 
 
 5
 On July 9, 1971, a truckload of banded ties was delivered to the Jeffersonville yard. Raymond Davis, a new employee working his fourth day for Republic, was present at the yard on that date. Davis had been hired to sort and stack ties after the completion of the unloading process. The unloader operator, James Wiseman, suggested to Davis on the day in question that he come to the unloading so that he could help sort the ties after they had been unloaded. Davis had never witnessed the unloading operation before nor had it been described to him. The field superintendent, Wallace Worley, however, when hiring Davis had told him 'not to get around no trucks; the unloader done all the unloading.'
 
 
 6
 Davis was originally standing some distance from the truck and Worley and Wiseman expected him to remain there until the unloading was completed. The chains had, at this time, already been removed from the truck but the unloader had not yet been moved into position. Without being ordered to do so and without informing anyone of what he intended to do, Davis went up to the truck and while standing on the ground next to the truck, cut the steel band on a package of ties with an ax. As a result, five of the ties fell on Davis, fatally injurying him.
 
 
 7
 On July 30, 1971, a compliance officer for the Secretary of Labor conducted an inspection of the Jeffersonville yard. On the basis of the inspection, the Secretary issued two citations to Republic for alleged violations of the Occupational Safety and Health Act:[2] a 'Citation for Serious Violation' based on the Davis accident; a 'Citation' based on the lack of warning signs and barricades around the piles of ties in the yard.
 
 
 8
 Republic filed a notice of contest and a hearing was held before an administrative law judge, who affirmed both citations but raised the second citation from a nonserious to a serious violation. The total penalty imposed was $1300.
 
 
 9
 Republic petitioned for discretionary review by the Occupational Safety and Health Review Commission. 29 C.F.R. 2200.91 (1973). The Commission (with one Commissioner dissenting) reversed the administrative law judge and vacated the citations.
 
 
 10
 The Secretary raises two issues on appeal: (1) whether the Occupational Safety and Health Review Commission erroneously held that the employer had not violated the 'general duty clause' (Section 5(a)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. 654(a)(1)), by failing to instruct and supervise properly an untrained employee regarding the hazards of unloading railroad ties; (2) whether the Commission erroneously held that the employer had not violated Section 5(a)(1) in permitting railroad ties to be stacked in unstable piles without warning signs or barricades.
 
 I.
 
 11
 The Occupational Safety and Health Act seeks to provide 'so far as possible every working man and woman in the Nation safe and healthful working conditions.' 29 U.S.C. 651(b). Penalties may be imposed by the Commission on employers in interstate commerce who violate the Act by failing to eliminate preventable dangers.
 
 
 12
 We note at the outset that the Occupational Safety and Health Review Commission is presumed to have technical expertise and experience in the field of job safety. A court must, therefore, defer to the findings and analysis of the Commission unless such findings are without substantial basis in fact. Federal Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972). The Act itself states: 'The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.' 29 U.S.C. 660. In addition, the Commission's interpretations regarding the meaning of the Act should be given substantial deference by a court.
 
 II.
 
 13
 The citation issued to Republic on the basis of the Davis accident[3] alleged a serious violation of the 'general duty clause' of the Act, 29 U.S.C. 654(a)(1), which provides:
 
 
 14
 'Each employer (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees . . ..'[4]
 
 
 15
 A 'serious violation' is present only where there is 'a substantial probability that death or serious physical harm could result from a condition which exists or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violations.' 29 U.S.C. 666(j). Republic does not dispute that the cutting of the band before the unloader was in place gave rise to 'a substantial probability that death or serious physical harm could result.' The issue on appeal is whether an employer, using reasonable diligence, would have foreseen the danger in question.
 
 
 16
 The Secretary contends that where an inexperienced, untrained employee is placed at the site of a potentially dangerous operation, the employer should foressee that the employee is likely, because of his ignorance of the safe procedures, to injure himself. Davis, the Secretary points out, was a new employee, working his fourth day for Republic. He had neither seen the unloading operation nor had it described to him. Davis was, nonetheless, asked by the unloader operator to be present at the place of the unloading. Since Davis did not know what the safe procedure for unloading the ties was, it was foreseeable, the Secretary argues, that Davis would do something unsafe and, thereby, injure himself-- even if the exact nature of his unsafe actions, i.e., cutting the band, could not have been foreseen. The fact that Davis was not assigned to assist in the actual unloading operation itself is irrelevant, according to the Secretary, since Davis was requested to be present at the unloading site. In such a situation, it is argued, the employee should be instructed in the safe procedure for the operation which is going on in his presence.
 
 
 17
 The Commission rejected the Secretary's argument on the theory that the Act does not require that a new employee always be trained in proper procedures for a task simply because he is required to be present at the place of the operation in question in which he is not a participant. We agree with the Commission's interpretation of the Act. The Act clearly requires that, for a serious-violation citation to be sustained, the danger must be one of which the employer knew or, with reasonable diligence, could have known. Whether training is necessary and the amount of any training required will depend on a number of factors, such as the experience of the employee in the particular field of work, the extent of the employee's participation in the operation in question, and the complexity and danger involved in the operation. Where an employee is directly participating in a job, the employer may well, as the Commission noted, have a duty under the Act to instruct him on the safe procedure for handling the job. On the other hand, the Commission accurately recognized that training may be unnecessary for an employee who is wholly disassociated with the operation in question and who would not be foreseeably exposed to danger.
 
 
 18
 The instruction given to Davis was general but explicit and unambiguous. Worley testified: 'I told him not to get around no trucks; the unloader done all the unloading.' We find that, under these circumstances, this instruction was sufficient to satisfy the employer's duty under the Act. It is true that the unloading could be dangerous if the proper procedure was not followed.[5] Davis' relationship with the trucks and the unloading, however, was very simple: he merely had to stay away from the trucks. This he was clearly told to do. The fact that he did not know the correct procedure for unloading a truck is immaterial since his own position with respect to the trucks had been stated in no uncertain terms: he was to stay away. In this situation, we agree with the Commission that a reasonably diligent employer would not have foreseen that Davis would injure himself.
 
 
 19
 This is not a case where the injury and death of Davis was the result of his, despite the admonition of Worley, getting too close 'around' the truck and being hit by a falling tie when, for example, a defective or stress-weakened band had snapped. Instead, the ties fell only because of the precipitous unanticipated act of Davis in chopping the band with an ax. The Secretary other than by bald statement does not indicate how this act could have been foreseen.[6]
 
 
 20
 We would not characterize the warning given to Davis, although explicit, as 'the best conceived and most vigorously enforced safety regime,' National Realty & Constr. Co., Inc. v. Occupational Safety & Health Review Comm'n, 489 F.2d 1257, 1266 (D.C.Cir. 1973) (J. Skelly Wright, J.). We are merely deciding that, in the absence of promulgated standards requiring appropriate warning signs or better training of employees, the conclusion reached by the Commission was within the scope of its discretion in interpreting the statute which it has special responsibility to enforce. Further, we agree with Judge Wright that 'Congress intended to require elimination only of preventable hazards.' Id.
 
 III.
 
 21
 The second citation issued to Republic states:
 
 
 22
 '1. Adequate warning signs prohibiting unauthorized foot or vehicle traffic in storage yard were not posted to cover all areas. '2. Unstable piles of cross ties are not barricaded or otherwise made safe.'This citation as issued did not propose a penalty; however, the administrative law judge modified the citation from nonserious to serious and imposed a penalty of $700.
 
 
 23
 As to part 1 of the citation, Republic argues that employees are authorized persons working in and around the piles of ties and that part 1 is therefore meaningless inasmuch as the Act is designed only for the safety of employees. There would appear to be merit in the contention, which we do not find satisfactorily countered by the Secretary. In any event, a disposition of part 2 of the citation contra to the position of the Secretary would seem to eliminate the necessity of the warning signs since the only claimed dangerous condition cited as the result of the inspection was that relating to the piles of ties.
 
 
 24
 There is substantial evidence with reference to the piles of ties as follows. The lift fork places the ties as they are removed from the truck in windrowed piles which are neatly stacked. The ties ordinarily remain as placed by the unloader for a short time although occasionally this may be for a few days. Employees pull or push the ties from the stacks and after sorting them put them into stacks of like kind ties which are also described as windrowed piles. As a part of this process, stacking strips, two inches by two inches, are placed between layers of ties which facilitates the passage of air. Windrowing, which according to Webster would appear to have its origin in drying processes of agricultural products, as used at the yard was merely a banausic way of accomplishing by air drying the necessary seasoning of the green wood.
 
 
 25
 It is not entirely clear from the citation whether part 2 was directed just to the original piles at the time of the removal from the truck, to the second apparently more carefully stacked phase, or to both. Employers subject to safety orders carrying the possibility of substantial penalties should not have to speculate as to the scope of a citation. Imprecise orders, of course, run the risk of being set aside but resort to the expenses, delays, and uncertainties of litigation should not be necessary.
 
 
 26
 For the present purposes, we will assume that the citation part 2 applies to all windrowed piles of ties.
 
 
 27
 The employer's obligation under the general duty clause is to maintain a workplace free from 'recognized hazards' which are causing or are likely to cause death or serious physical harm to employees. A 'recognized hazard' has been defined as 'a condition that is known to be hazardous, and is known not necessarily by each and every individual employer but is known taking into account the standard of knowledge in the industry . . .. Whether or not a hazard is 'recognized' is a matter for objective determination . . ..'[7] The issue before the Commission was whether the failure to place barricades and warning signs around the windrowed piles of ties was a 'recognized hazard,' as this term is used in the Act.
 
 
 28
 The Secretary argues that the windrowed piles of green ties, which tend to warp slightly, are unstable and, therefore, the failure to barricade such piles is hazardous. After reviewing the testimony and stipulated facts, the Commission concluded that the Secretary had failed to prove that any hazard, if one existed at all, was recognized by the appropriate industry. This finding of the Commission must be upheld if supported by substantial evidence.
 
 
 29
 Upon the basis of the record, we hold that there is substantial evidence to support the Commission's finding. At the hearing, the Secretary's compliance officer admitted that employees could tell whether a particular stack of tieswas stable and that they could work safely with windrowed piles, if the employees knew what they were doing.[8] The evidence also indicated that Republic had not had a serious accident resulting from the work with the piles in seven years.[9]
 
 
 30
 Noting that the Secretary has the burden of proving all elements of a violation, 29 C.F.R. 2200.73, we agree with the Commission that the Secretary failed to present sufficient evidence that the hazard was a 'recognized hazard' in the industry.
 
 
 31
 Finally, we note that the dissenting Commissioner took the position, which is urged by the Secretary on this appeal, that the Commission erred in putting Republic in the wood treatment industry rather than material handling as to which the Secretary's representative who had made the inspection testified as an expert witness, '. . . this is a recognized hazard in materials handling, that unstable piles will cause-- will fall and cause serious injury . . ..'
 
 
 32
 As the majority Commissioners point out, the windrowed piling was done for a specific purpose, i.e., that of seasoning the wood. This was not a case of employees constantly being engaged in the handling and moving in and out of materials. While no doubt any employee who is engaged in handling heavy materials for placing them in a quasi-storage basis may be injured during the course of that handling we do not conceive that Congress intended the Act to impose strict liability.
 
 
 33
 In sum, the decision of the Commission is supported by substantial evidence and it therefore is
 
 
 34
 Affirmed.
 
 
 
 [1]
 Decision and Order of the Occupational Safety and Health Review Commission, OSHRC Docket No. 22, Feb. 9, 1973. Review by this court is available under 29 U.S.C. 660(b)
 
 
 [2]
 Issued pursuant to 29 U.S.C. 658
 
 
 [3]
 The following 'Description of alleged violation' was set forth in the citation:
 'Binders on the cross tie load were released without securing with unloading lines or other unloading device. This is a serious condition which could, in fact did, cause a fatality to an employee.'
 
 
 [4]
 In addition to this general duty to eliminate avoidable hazards to life, limb or health of the workers, the employer has, under the Act, the duty to conform to any health and safety standards promulgated by the Secretary of Labor. In the present case, the parties agree that there were no such specific standards applying to Republic at the time that the citations were issued
 
 
 [5]
 The Secretary of Labor does not appear to argue that the normal unloading procedure followed by Republic was unsafe
 
 
 [6]
 We also note that in his original brief the Secretary refers to Davis being ordered to assist a crew in unloading the truck, and in his reply brief he states that 'Davis was actually ordered to assist a crew in unloading ties.' These statements are without support in the record before us. Likewise the Secretary's brief references to an untrained employee being permitted 'to participate in a hazardous unloading operation' are unwarranted and inconsistent with the facts before the Commission
 
 
 [7]
 This definition was originally offered by Congressman Daniels, 116 Cong.Rec. 38377 (1970). See also National Realty & Constr. Co., Inc. v. Occupational Safety & Health Review Comm'n, supra at 1265 n. 32
 
 
 [8]
 The evidence indicated that Republic did train its employees as to the proper methods for working with the piles
 
 
 [9]
 The lack of an accident could have been fortuitous but a high rate of accidents resulting in injuries from the same cause is often given some weight as being symptomatic of a dangerous situation. Conversely, we cannot say that the lack of accidents does not enter the substantial evidence picture as a factor