**BETHLEHEM STEEL CORPORATION, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Ray Marshall, Secretary of Labor, United States Department of Labor, Respondents.**

No. 79–1041.

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1979.

Decided Oct. 15, 1979.

Denis V. Brenan (argued), Richard F. McMenamin, Morgan, Lewis & Bockius, Philadelphia, Pa., for petitioner.

Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol., Allen H. Feldman, Acting Counsel for Appellate Litigation, Dennis K. Kade, Asst. Counsel for Appel-

late Litigation, Laura A. Fargas (argued), U.S. Dept. of Labor, Washington, D.C., Marshall H. Harris, Regional Sol., Philadelphia, Pa. for respondent.

Before SEITZ, Chief Judge, and GIBBONS and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Bethlehem Steel Corporation (Bethlehem), the operator of a ship repair yard at Hoboken, New Jersey, petitions under section 11(a) of the Occupational Safety and Health Act, 29 U.S.C. § 660(a) (1976) (the Act), for review of an order of the Occupational Safety and Health Review Commission (OSHRC) finding that Bethlehem violated the general duty clause, section 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1) (1976), and a specific safety standard, 29 C.F.R. § 1915.-66(c) (1978), promulgated pursuant to section 5(a)(2) of the Act, 29 U.S.C. § 654(a)(2) (1976). We affirm the Commission's Order finding a general duty clause violation, but set aside the Order respecting the violation of the specific safety standard.

## I.

On January 20, 1978 five employees of Bethlehem were directed to remove from the hold of the S.S. PENTELI a 300 foot long electric cable used to provide power to the vessel from shore while it was undergoing repairs. During the course of this operation Richard Brown, one of the employees, fell from an upper deck to a lower deck of the S.S. PENTELI, suffering injuries from which he died the same day. As is customary in cases of industrial accidents resulting in death, a Labor Department Compliance Officer conducted an inspection of the site of the accident. At the time of this inspection, the vessel had already sailed and only the pier alongside which it had been moored could be inspected. On March 14, 1978, the Secretary of Labor issued a citation under section 9 of the Act, 29 U.S.C. § 658 (1976),

charging Bethlehem with violations of the general duty clause, 29 U.S.C. § 654(a)(1) (1976), of the specific ship repair safety standard requiring elimination of slippery conditions in working areas of shipyards, 29 C.F.R. § 1915.51(c) (1978), and of the specific safety standard requiring the use of tag lines, 29 C.F.R. § 1915.66(c) (1978). Bethlehem filed a timely notice of contest, and the Secretary filed a complaint to the Commission repeating the charges in the citation. A hearing before an Administrative Law Judge resulted in a finding that Bethlehem had violated the general duty clause and the tag line standard, but not the slippery surface standard. When Bethlehem's petition to the Commission for discretionary review was not granted, the Administrative Law Judge's order became the Final Order of the Commission, and the petition for review in this court followed.

The evidence presented at the hearing on the Secretary's complaint disclosed that on January 20, 1978, Hoboken and the vicinity was subjected to a severe snowstorm accompanied by high winds. Shortly after one o'clock in the afternoon, several Bethlehem employees were directed to remove the power cable from the vessel. The cable extended from a power source on the pier over the rail of the vessel and through a skylight on an upper deck to the engine room below. It was fastened to the rail at approximately its midpoint. The method normally used to remove such a power cable is hoisting it out of the engine room by crane through the skylight in several small bites, and depositing each bite on the deck until the bitter end emerges from the skylight. Then the cable is unfastened from the rail and lifted to the pier. Although the evidence might support other conclusions, it was the Secretary's contention that the accident occurred because, as the bitter end emerged from the skylight, the cable swung free, hitting Mr. Brown in the head, and knocking him over the rail to the deck below. Bethlehem argues that the accident did not and could not have happened in that manner, and that neither the adverse wind

and snow conditions nor the absence of tag lines on the bitter end of the cable contributed to the accident.

## II.

■ Much of Bethlehem's argument concerning the way in which the accident may have occurred is misdirected, for although the occurrence of a death or serious injury may be relevant to proving a violation of the general duty clause, the statute is violated when a recognized hazard is maintained, whether or not an injury occurs. *See, e.g., Allis-Chalmers Corp. v. OSHRC,* 542 F.2d 27, 30–31 (7th Cir. 1976); *REA Express, Inc. v. Brennan,* 495 F.2d 822, 825 (2d Cir. 1974); *Brennan v. OSHRC (Vy Lactos),* 494 F.2d 460, 463 (8th Cir. 1974). Moreover, an employer may be found not to have violated the general duty clause notwithstanding the occurrence of a death if the hazard was unforeseeable. *See Brennan v. OSHRC (Republic Creosoting Co.)* 501 F.2d 1196, 1199–1200 (7th Cir. 1974). Our task on review is not to look for a proximate cause relationship between the accident which preceded the inspection and the specific violation charged, but to determine whether there is substantial evidence in the record supporting the charge that the employer maintained, at the time and place alleged, a recognized hazard to the safety of its employees.

We have no difficulty finding such evidence here. There is evidence that the snowstorm on January 20, 1978 had caused accumulations of 12 to 14 inches of snow on the decks of the vessel, that the mobile crane was frozen in its tracks, that visibility for the crane's operator was limited because the window of the cab had fogged up and the cab lacked wiper blades, and that high wind conditions made it difficult for the operator to control the swing of the boom. There is in evidence a Standard promulgated by the American National Standards Institute (ANSI) and referred to in the citation, which states:

*l.* Cranes shall not be operated when wind speeds exceed 45 miles per hour or lower velocities if so recommended by the manufacturer.

ANSI, *Portal, Tower and Piller Cranes* B30.4, § 4–3.1.3*l* (1973). Although, unlike many ANSI standards, this one has not been promulgated by the Secretary as a specific standard, Bethlehem's safety officer testified that it represented a consensus in the ship repair industry. Also in evidence is the Handbook of Industrial Loss Prevention, an insurance industry publication for general usage, which, with respect to cranes recommends:

Wind-velocity alarms are used on large or important cranes of various types. They should be set to give an alarm at 35 mph.

Factory Mutual Engineering Corp., Handbook of Industrial Loss Prevention 78–8 (2d ed.).

■ There is testimony by the OSHA Compliance Officer that during storms when the winds exceeded 30 miles per hour, other shipyards tie down a crane. There is no dispute that the men in charge of the operation of the yard on January 20, 1978 were generally aware of the high wind conditions, because several telephone calls were placed to the Weather Service on the day of the accident. While there is no precise record of wind speeds at the Hoboken yard on that date, three meteorological reports are in evidence. The National Weather Service, located at Central Park, New York, to the east of Hoboken, recorded surface observations of wind speeds of between 26 and 32 m. p. h. in the relevant time period, and a gust of 46 m. p. h. between 3:00 p. m. and 4:00 p. m. The same source recorded the highest wind speed, as distinguished from peak gusts, of 32 m. p. h. on that day. A third meteorological report, this one from the National Weather Service Wind Observations at Newark Airport, southwest of Hoboken, reported an average wind speed of 19.3 m. p. h. and a peak gust of 42 m. p. h. recorded at 12:54 p. m. It was not illogical for the Administrative Law Judge to conclude that on the afternoon of January 20, there were gusts exceeding 40 m. p. h. in the Hoboken shipyard.

From this evidence the Administrative Law Judge could have found, as he did: (1) that operation of a crane during weather conditions in which peak winds exceeded safe operating limits was a recognized hazard in the ship repair industry; (2) that such operation was likely to cause death or serious physical injury; and (3) that operation during such weather conditions in fact occurred on January 20, 1978. There was no requirement that the Commission find that the hazard proximately caused Mr. Brown's death.

There is much to be said for Bethlehem's argument that a ship repair yard cannot simply suspend operations during inclement weather. Ships sail during all seasons of the year and are committed to yards for repairs subject to contractual deadlines which must be met even if the elements are uncooperative. The general duty clause must be applied to the ship repair industry in a manner consistent with the realities of year-round out-of-doors operation. However, even with all of these considerations in mind, there remain recognized hazards, and we cannot say that the Commission's conclusion that operating a crane in near-blizzard conditions was such a hazard is not supported by substantial evidence.

■ We also reject Bethlehem's argument that the general duty clause is unconstitutionally vague. The "recognized hazard" standard, in our view, gives industrial employers fair notice of the conduct they must avoid.

### III.

■ Bethlehem is also charged with a violation of the specific safety standard requiring the use of tag lines. 29 C.F.R. § 1915.66(c) (1978). This standard does not apply to every load, but only to loads "likely to swing or to need guidance." *Id.* It is undisputed that tag lines were not used on the cable in question. The Secretary relies on the testimony of the OSHA Compliance Officer as evidence that tag lines should have been fastened to the bitter end of the cable to prevent it from swinging as it emerged from the skylight. On close examination, however, that testimony indicates that the Compliance Officer believed that *every* load lifted by a crane ought to be guided by tag lines. The ship repair standard does not so provide. Joseph LaRocca, a rigging expert, testified that a cable being lifted by a crane would be unlikely to swing even if the crane stopped suddenly. Joseph P. Eagen, a safety engineer, testified that in his considerable experience he had never seen a tag line used in lifting uncoiled cable in any shipyard on the east coast. He expressed the opinion that such lines are not necessary because the cable is not likely to swing, and because its movement is controllable without their use. Against this unequivocal testimony of recognized experts that tag lines are not generally used on dangling cables and that persons knowledgeable in the industry consider such loads unlikely to swing, the opinion of the Compliance Officer, which is actually at variance with the promulgated safety standard, is not substantial evidence upon which the Commission can predicate a violation of a generally worded safety standard. *See B & B Insulation, Inc. v. OSHRC*, 583 F.2d 1364, 1372 (5th Cir. 1978).

### IV.

■ Bethlehem, relying on *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), contends that the order of the Commission should not be enforced because the inspection of Bethlehem's shipyard was accomplished without a warrant. No fourth amendment objection was made at the time of the inspection. Bethlehem urges that since the inspection occurred prior to the decision, on May 23, 1978, in *Barlow's*, its compliance with the demand for a warrantless entry should not be deemed a knowing and voluntary waiver of its fourth amendment rights. *See Bumper v. North Carolina*, 391 U.S. 543,

548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). We need not, however, decide either the waiver question or the related question of whether *Barlow's* should apply to inspections carried out prior to May 23, 1978. In this case the facts surrounding the search were known to Bethlehem, and the administrative hearing was not held until June 20, 1978, four weeks after *Barlow's* was filed. This statute upon which our authority to review depends provides that "[n]o objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 660(a) (1976). Bethlehem contends that this provision should not apply to a constitutional claim because an administrative agency is not competent to decide such a claim. *See Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Conceding, arguendo, that an administrative agency is not ordinarily considered the appropriate forum for the resolution of constitutional claims, we think there are compelling reasons for insisting that fourth amendment claims for the suppression of evidence in OSHA enforcement cases be tendered first to the Commission. Those claims in most cases, if not all, require the development of a factual record concerning such issues as consent, waiver, and emergency. Under the enforcement and review scheme of the Occupational Safety and Health Act, 29 U.S.C. §§ 658–660 (1976), the Commission is the only tribunal available for the development of a factual record. If we were to hold that these constitutional arguments need not be presented to the Commission, the alternative would be either separate litigation in a district court, which has facilities for making a record, or factfinding in this court, which lacks such facilities. Assuming we could find a statutory justification for either course, neither is attractive. Thus we hold that fourth amendment claims must be presented, in the first instance, to the Commission. *See Marshall v. Able Contractors, Inc.*, 573 F.2d 1055, 1057 (9th Cir.) (per curiam), *cert. denied*, 439 U.S. 826, 99 S.Ct. 98, 58 L.Ed.2d 119 (1978).

■ We could, of course, remand for factfinding on the fourth amendment claim. However, because at least four weeks elapsed after the filing of the *Barlow's* decision, during which Bethlehem could have raised the issue before the Commission, we find no "extraordinary circumstances" justifying a remand. Cf. *Todd Shipyards Corp. v. Secretary of Labor*, 586 F.2d 683, 688–89 (9th Cir. 1978). Thus we decline to consider Bethlehem's fourth amendment contention.

## V.

■ Finally, Bethlehem urges that the Commission's order should be set aside because the Secretary's citation was not issued with the "reasonable promptness" required by section 9(a) of the Act, 29 U.S.C. § 658(a) (1976). Seven weeks elapsed between the inspection and the issuance of the citation. No showing has been made that Bethlehem was in any way prejudiced by the delay. In *United States Steel Corp. v. OSHRC*, 537 F.2d 780 (3d Cir. 1976), we rejected a construction of section 9(a) that would have imposed a mechanical time period for the issuance of citations. *Id.* at 784. Cases in other courts have reached the same conclusion. *See United Parcel Serv. v. OSHRC*, 570 F.2d 806, 809–10 (8th Cir. 1978); *Todd Shipyards Corp. v. Secretary of Labor*, 566 F.2d 1327, 1329–30 (9th Cir. 1977) (per curiam); *Brennan v. Chicago Bridge & Iron Co.*, 514 F.2d 1082, 1085 (7th Cir. 1975) (per curiam). We hold that at least in the absence of any showing by the respondent of prejudice resulting from delay in issuing the citation, a delay of seven weeks between an inspection and the issuance of a citation does not require its dismissal.

## VI.

The order finding a violation of 29 C.F.R. § 1915.66(c) is not supported by substantial

evidence and will be set aside. The order finding a violation of the general duty clause by the operation of a crane in near-blizzard conditions is so supported and will be affirmed. Each party will bear its own costs.