# J. I. HASS CO., INC. *v.* DEPARTMENT OF LICENS-
ING AND REGULATION, DIVISION OF LABOR
AND INDUSTRY FOR THE STATE
OF MARYLAND

[No. 207, September Term, 1974.]

*Decided June 26, 1975.*

322

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Martin J. Snider,* with whom were *George N. Manis* and *Manis, Wilkinson & Snider* on the brief, for appellant.

*Henry R. Wolfe, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Edward M. Ranier, Assistant Attorney General,* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court. SINGLEY and SMITH, JJ., concur in the result and SINGLEY, J., filed a concurring opinion in which SMITH, J., concurs at page 339 *infra.*

This appeal stems from a determination by the Maryland Commissioner of Labor and Industry (the Commissioner) that appellant, J. I. Hass Co., Inc. (the employer), had violated two safety standards promulgated pursuant to the

Maryland Occupational Safety and Health Law of 1973, Maryland Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.) Art. 89, §§ 28-49B (the Maryland Act). On appeal to the Circuit Court for Queen Anne's County, that determination and the civil penalties of $9,000 and $3,000 imposed therein were affirmed.

In 1973, the employer was engaged in painting the new parallel span of the Chesapeake Bay Bridge (the William Preston Lane Memorial Bridge). On September 6, while being lowered into position to do some sandblasting, two of its employees plummeted into the Bay some 40 feet below when a cable unraveled from a winch and their scaffold collapsed. One of the men swam to safety and was rescued; the body of the other, who died of drowning, was recovered four days later. As a consequence, the employer was cited by appellee, Department of Licensing and Regulation, Division of Labor and Industry, with violations of two safety standards: 29 C.F.R. 1926.451(i)(8) (hereinafter referred to as (i)(8)) — "Fail[ure] to have men wearing safety belts secured to a substantial member of the structure . . ."; and 29 C.F.R. 1926.451(i)(11) (hereinafter referred to as (i)(11)) — "Guardrails 42 inches in height, with a midrail and toe boards not in use on all four sides of scaffolds . . . ." These violations were characterized as "Serious and Repeated" under the Act.[1]

Previously, on July 27, a similar tragedy had occurred which also resulted in the death of one employee. Citations

---

1. In relevant part, (i)(8) provides:

"Each employee shall be protected by an approved safety life belt attached to a lifeline. The lifeline shall be securely attached to substantial members of the structure (not scaffold), or to securely rigged lines, which will safely suspend the employees in case of a fall. . . ."

Standard (i)(11) provides:

"Guardrails, not less than 2 x 4 inches, or the equivalent, approximately 42 inches high, with a midrail, and toe-boards, shall be installed at all open sides and ends on all scaffolds more than 6 feet above the ground or floor. Toe-boards shall be a minimum of four inches in height. Wire mesh shall be installed in accordance with paragraph (a)(6) of this section."

had been issued at that time: One for violating (i)(8) — "Fail[ure] to require lifelines to be tied off to independent point above scaffold . . ."; and the other for violating (i)(11) — "Failure to provide top guardrails on both open end or open side of two point suspension scaffold and no toe boards or midrails at any point on the scaffold . . . ." These violations were designated as "serious" and "willful" within the meaning of the Act, and respective penalties of $5,000 and $2,000 were imposed. The employer paid both and took no steps to challenge the citations — administratively or judicially — as it has done here.

The facts giving rise to these proceedings are virtually free of dispute. Although there were no eyewitnesses to the actual mishap, the uncontroverted evidence shows that while the employer had provided the required safety belts, which were attached to lifelines properly secured to the bridge superstructure, neither of the two workmen was wearing his safety belt when the scaffold collapsed.[2] It is equally uncontroverted that the scaffold had only a back guardrail — with none provided at the front or ends — and no midrails or toeboards.

Concerned with the "number and severity of work-related injuries and illnesses which, despite current efforts of employers and government, are resulting in ever-increasing human misery and economic loss,"[3] Congress enacted the Occupational Safety and Health Act of 1970 (the Federal Act), 29 U.S.C. § 651 et seq. Declaring as its purpose "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources," 29 U.S.C. § 651 (b), the Federal Act achieves its objectives through programs of research, education and training, and through the

---

2. The only evidence tending to show that the required safety equipment was not available during the critical moments of September 6 came in the form of a written statement given by the surviving employee to an occupational safety inspector later that day. On the following day, however, he recanted while being interviewed by an insurance claim supervisor. That the employer did furnish the required equipment was acknowledged by the Commissioner, and is accepted by appellee.

3. S. Rep. No. 91-1282, 91st Cong., 2d Sess. (1970).

development and administration, by the Secretary of Labor, of uniformly applied occupational safety and health standards. As noted in *Brennan v. Occupational Safety & Health Review Com'n*, 487 F. 2d 438, 439 (8th Cir. 1973):

> "The Act provides for the development of a 'laundry-list' of violations. Companies are subject to periodic compliance inspections which are carried out at random either upon complaints or upon the inspector's own initiative. Advance notice of an inspection is prohibited, and violators of this provision are subject to criminal sanctions. Violations may be either of standards promulgated by the Secretary [of Labor] or of the 'general duty' provision, a catch-all provision intended to supplement the standards formulated by the Secretary."

The heart of the Federal Act is the power conferred by § 655 upon the Secretary of Labor to promulgate occupational safety and health standards.[4] That section designates specific and detailed procedures to be followed in the promulgation of standards, including publication in the Federal Register, the right of the public to submit written data or comments, a public hearing if requested, and a right of appeal to the United States Court of Appeals. In the first two years after the Federal Act became effective, however, the Secretary was empowered to adopt, without adhering to the full procedure, any national consensus standard [5] or any established federal standard.[6] The Secretary is also granted

---

**4.** Defined in § 652 (8) as a "standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment."

**5.** A standard "which (1), has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the Secretary, after consultation with other appropriate Federal agencies." § 652 (9).

**6.** A standard "established by any agency of the United States and

the power to provide for emergency temporary standards, and, at the request of an employer, to permit a variance from a standard.

Section 654 (a) of the Federal Act imposes a two-fold obligation upon each employer:

> "(1) [to] furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
>
> "(2) [to] comply with the occupational safety and health standards promulgated under this chapter."

When finding a violation of the general duty clause or a specific standard, the Secretary must issue a citation, specifying the violation and fixing a reasonable time for its abatement; and must notify the employer of any proposed penalty. The citation and penalty become final if the employer does not contest them within 15 days.

The civil penalties prescribed by § 666 fall into four categories:

1) A discretionary penalty of not more than $10,000 for an employer who willfully or repeatedly violates any standard;

2) A mandatory penalty of up to $1,000 for a serious violation;

3) A discretionary penalty of up to $1,000 for a violation specifically determined not to be of a serious nature;

4) A discretionary penalty of not more than $1,000 for each day during which a violation continues beyond the time permitted for its correction.

All contested cases are heard by the Occupational Safety and Health Review Commission, an independent adjudicatory agency.

In addition to the duties imposed upon employers, each employee must "comply with occupational safety and health

presently in effect, or contained in any Act of Congress in force on December 29, 1970." § 652 (10).

standards and all rules, regulations, and orders ... which are applicable to his own actions and conduct." § 654 (b).

In furtherance of its purposes, the Federal Act contemplates extensive state participation in the occupational safety and health field. The states may assert "jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under [the Federal Act]." § 667 (a). The states are permitted to assume responsibility for development and enforcement of "occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 ..."; the statute provides for the submission of plans designed to achieve these ends. Subsection (c) of § 667 calls for approval of such plans if, in the judgment of the Secretary, they meet the conditions specified in the Federal Act. The primary requirement is that the state plan be at least as effective in providing safe and healthful employment and places of employment as the federal plan.

The Maryland Occupational Safety and Health Law, Art. 89, §§ 28-49B, was enacted as Chapter 59 of the Laws of 1973, effective July 1 of that year. It is substantially similar to the Federal Act. It vests in the Commissioner of Labor and Industry "the power and authority to administer and enforce the provisions of this subtitle and [the duty to] prescribe such rules and regulations as he may deem necessary to carry out his responsibilities under this subtitle." Art. 89, § 30. Essentially, it tracks the Federal Act in providing for the promulgation of occupational safety and health standards; and in fixing the duties of the employers and employees, and in establishing citation and enforcement procedures. Additionally, the State Act adopts the same civil penalties that are specified in the Federal Act. With particular reference to the standards, § 31 (c) of the State Act provides that: "... [T]he Board shall recommend or propose occupational safety and health standards which are or will be at least as effective in providing safe and healthful employment and places of employment as any standard

promulgated under the federal Occupational Safety and Health Act of 1970 . . . ."

Having met the applicable federal requirements, the State Act received the approval of the Secretary of Labor on July 5, 1973. 38 Fed. Reg. 17834. Thereafter, the Commissioner, acting on the recommendation of the Occupational Safety and Health Advisory Board created pursuant to § 31 (a) of the State Act, adopted as standards under the state plan the general industry standards (29 C.F.R. § 1910) and the construction standards (29 C.F.R. § 1926) promulgated by the Secretary of Labor under the Federal Act. Thus, the standards set forth in 29 C.F.R. § 1926, including the two standards which appellant is here charged with violating, are incorporated into the state plan.

Section 38 of Art. 89 provides for judicial review of the Commissioner's decisions and states: "The findings of the Commissioner with respect to questions of fact, as supported by substantial evidence, shall be conclusive. The court shall determine whether the rule, regulation, standard or order is in accordance with law. . . ." Subsection (b) provides: "In any proceeding under this section, rules, regulations and standards of the Commissioner shall be deemed prima facie lawful and reasonable."

It was against this legislative and regulatory background that the citations in this case were issued, and that the hearing was held before an examiner designated by the Commissioner. With respect to (i)(8), the Commissioner, acting on the findings of the examiner, found "sufficient evidence that the men who fell into the bay were not wearing safety belts secured to a substantial member of the structure . . . ." He therefore concluded that there was a violation of the standard. Since the employer had previously been cited for violating (i)(8), the September violation was deemed to be "serious" and "repeated"; thus, the $9,000 penalty was imposed. With regard to (i)(11), this finding was made:

"The evidence from the testimony and the admission of representatives of the 'Employer'

clearly show there were no guardrails on the front or the end and had no midrail or toe-boards . . . . It is the opinion of the Hearing Examiner that alleged justifications for not providing the necessary guardrails are not in conformity with the law. Although the 'Employer' and his representatives have strong opinions concerning hazards of guardrails especially the front guardrails, they did not avail themselves of the opportunity, under Article 89, Section 34(a), (b), (c), and (d) to request a variance, but chose to ignore the standard. It is the opinion of the Hearing Examiner that the 'Employer' has not acted in good faith. Therefore, the Hearing Examiner concludes that there was a violation of Standard 29CFR1926.451(i)(11)."

Since the employer also had violated this standard previously, the violation was found to be "serious" and "repeated." The proposed penalty of $3,500, however, was reduced to $3,000 by the Commissioner.

## (1)

### The (i)(8) Standard

In respect to the (i)(8) standard, appellee contends that this violation was established merely by the uncontroverted evidence that at the time of the accident, the two employees were not wearing the safety belts. Under this view, the fact that they had been provided and were attached to a lifeline secured to the superstructure did not establish compliance. In short, the requirement of the safety standard that the employee "be protected by an approved safety life belt attached to a lifeline" means that they must be worn, not simply furnished.

The employer, though not disputing the evidence, challenges the construction placed upon the standard by appellee. It contends that the employees were "protected" within the contemplation of (i)(8), but simply refused to wear the safety belts. The employer maintains that it would

have been virtually impossible for it to have been aware that the employees — being fearful of becoming ensnarled in the lines while lowering the scaffold — would unhook their belts moments before the incident. The employer argues with considerable logic that compliance with this standard, as interpreted by the Commissioner, would impose a requirement incapable of being met — constant surveillance by at least one monitor for each pair of workmen. Finally, the employer claims that scaffold workers are an unusual breed of men who traditionally resist the use of safety belts. Prior to this occurrence, nevertheless, it had taken the following steps in an effort to obtain compliance with the safety belt standards. It had:

1) Conducted weekly safety classes.

2) Provided each employee with a safety belt attached to independent lines.

3) Empowered the Shop Steward with authority to discharge any employee not wearing a safety belt "tied off," an authorization which was uncommonly broad for this field.

4) Instructed all supervisors to observe the men, and to report any employee not wearing a safety belt properly tied.

5) Fired two employees for refusing to wear their safety belts properly tied.

Thus, the employer maintains that it was not in violation of (i)(8) on September 6, 1973. Additionally, it contends that if there was such a violation, it was not of a "serious and repeated" nature, and that the penalty was improper because the Commissioner did not consider all the statutory criteria applicable to the assessment of penalties.[7]

Since the Maryland Act is patterned on the Federal Act — this being our first encounter with either — we look to the federal cases for guidance. The major authority in this area

---

7. No attack is made here upon the constitutionality of the penalty provisions, nor upon any other part of the State Act. Consequently, we do not consider that question here.

is *National Rlty. & C. Co., Inc. v. Occupational S. & H. R. Com'n,* 489 F. 2d 1257 (D.C. Cir. 1973). There, National Realty was charged with a violation of the general duty clause, § 654 (a)(1), when an employee was injured while riding, contrary to the instructions of his employer, on the front of a loader. In construing the phrase "free from recognized hazards" in (a)(1), the court said:

> "Construing the term in the present context presents a dilemma. On the one hand, the adjective is unqualified and absolute: A workplace cannot be just 'reasonably free' of a hazard, or merely as free as the average workplace in the industry. On the other hand, Congress quite clearly did not intend the general duty clause to impose strict liability: The duty was to be an achievable one. Congress' language is consonant with its intent only where the 'recognized' hazard in question *can be* totally eliminated from a workplace. A hazard consisting of conduct by employees, such as equipment riding, cannot, however, be totally eliminated. A demented, suicidal, or willfully reckless employee may on occasion circumvent the best conceived and most vigorously enforced safety regime. This seeming dilemma is, however, soluble within the literal structure of the general duty clause. Congress intended to require elimination only of preventable hazards. It follows, we think, that Congress did not intend unpreventable hazards to be considered 'recognized' under the clause. Though a generic form of hazardous conduct, such as equipment riding, may be 'recognized,' unpreventable instances of it are not, and thus the possibility of their occurrence at a workplace is not inconsistent with the workplace being 'free' of recognized hazards." 489 F. 2d at 1265-66 (emphasis in original).

The court then went on to conclude:

> ". . . To establish a violation of the general duty

clause, hazardous conduct need not actually have occurred, for a safety program's feasibly curable inadequacies may sometimes be demonstrated before employees have acted dangerously. At the same time, however, actual occurrence of hazardous conduct is not, by itself, sufficient evidence of a violation, even when the conduct has led to injury. The record must additionally indicate that *demonstrably feasible measures would have materially reduced the likelihood that such misconduct would have occurred.*" 489 F. 2d at 1267 (emphasis added).

This rationale has been followed by a series of federal appellate cases and by several decisions of the Federal Occupational Safety and Health Review Commission: *Brennan v. Occupational Safety & Health Review Com'n,* 502 F. 2d 946 (3rd Cir. 1974) (upholding, as supported by substantial evidence, rejection by the Commission of Secretary's contention that would have required closer supervision); *Brennan v. Occupational Safety & Health Review Com'n,* 501 F. 2d 1196 (7th Cir. 1974) (instruction to employee to stay away from unloading truck satisfied employer's burden); *Secretary of Labor v. Richmond Block, Inc.,* OSHRC Docket No. 82, 1973-74 CCH-OSHD, ¶ 17,137 (January 11, 1974); *Secretary of Labor v. Canrad Precision Industries, Inc., Hanovia Lamp Division,* OSHRC Docket No. 89, 1971-73 CCH-OSHD, ¶ 15,355 (December 13, 1972), *aff'd, Brennan v. Occupational Safety & Health Review Com'n, supra,* 502 F. 2d 946; *Secretary of Labor v. Standard Glass Co., Inc.,* OSHRC Docket No. 259, 1971-73 CCH-OSHD, ¶ 15,146 (June 26, 1972); *see REA Express, Inc. v. Brennan,* 495 F. 2d 822, 826 (2d Cir. 1974).

In the *Canrad* case, the Review Commission said:

". . . While close supervision may be required in some cases to avoid accidents, it is unrealistic to expect an experienced and well-qualified laboratory technician to be under constant scrutiny. Such a holding by the Commission, requiring that each

employee be constantly watched by a supervisor, would be totally impractical and, in all but the most unusual circumstances, an unnecessary burden."

Similarly, in *Standard Glass*, the Commission explained:

"An employer cannot in all circumstances be held to the strict standard of being an absolute guarantor or insurer that his employees will observe all the Secretary's standards at all times. An isolated brief violation of a standard by an employee which is unknown to the employer and is contrary to both the employer's instructions and a company work rule which the employer has uniformly enforced does not necessarily constitute a violation of section [654 (a) (2)] of the Act by the employer."

Although many of these cases have dealt with the general duty clause, the same principles apply to a violation of a specific standard. Since the purpose of the State Act is "to assure as far as possible every working man and woman in the State of Maryland safe and healthful working conditions and to preserve our human resources," Art. 89, § 28 (c), and not to impose strict liability on employers, the effort made by the employer to prevent hazards is the focal point, not the happening of the accident.

The common thread running through the cases, therefore, is that the employer cannot be charged with being an insurer, or be held accountable to a standard of strict liability. As we have indicated, acceptance of the argument advanced by appellee would have the effect of imposing such a standard in this case. Here, the employer undertook all reasonable means to compel its employees to wear their properly attached safety belts. The evidence further shows that two of them were fired for failing to observe this procedure. In short, the Commissioner has failed to indicate "that demonstrably feasible measures would have materially reduced the likelihood that such misconduct would have occurred." For these reasons, the determination

respecting standard (i)(8) and the $9,000 penalty assessed against appellant must be reversed.

In light of our disposition of these issues, it is unnecessary for us to consider whether the violations were "serious and repeated," or whether, in fixing the penalty, the Commissioner took proper account of the statutory criteria.

(2)

The (i)(11) Standard

With respect to the violation of (i)(11), as we have noted, the absence of the required guardrails on the front and side, as well as the midrails and the toe boards, is admitted by the employer. The defense to this citation is that the general duty imposed by Art. 89, § 32 (a) (1), that each employer shall "furnish to each of his employees employment and a place of employment which are safe and healthful as well as free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees," fastens upon it the duty to create the safest possible work environment, even if this means violating a specific standard. The employer thus claims as an affirmative defense to the alleged violation of standard (i)(11) that the actual working conditions were safer than those contemplated by the standard.

The employer buttresses its contention that the required guardrails would have increased the hazard by pointing to the testimony which it presented. The chief construction inspector of the general contractor, for example, a longtime veteran of bridge construction, gave this testimony:

> "Q. Do you feel that [the front guardrail requirement] is a hazard? A. I feel it could be a hazard because you're going to have to get around it anyway and to do it you're either going to have to go under it or over it and, therefore, you're creating a hazard of your own."

The employer's superintendent on this project, also experienced in bridge construction, testified as follows:

> "Q. Could you explain to me why you believe the front rail is more hazardous when you are painting the bridge than when you don't have it? A. That front rail — the men would either have to climb over or go under. When they're cranking them scaffolds they bump elbows. It's more of a hazard than serves the purpose of safety."

In response to this contention, appellee maintains that the employer should have sought a variance pursuant to § 34 of Art. 89, which requires an applicant for such relief to demonstrate by a preponderance of the evidence that the employer will provide "places of employment to his employees which are as safe and healthful as those which would prevail if he complied with the ... standard from which the variance is sought." The employer acknowledges that no such variance was sought respecting the guardrail requirement. It parries this thrust, however, with the contention that it was not required to do so if the substantial evidence shows that compliance with the standard would have created a greater hazard than that sought to be avoided. In effect, the argument is that in such circumstances an exception to the standard must be implied.

The Federal Occupational Safety and Health Review Commission has had occasion to consider the question posed by these contentions in *Secretary of Labor v. Industrial Steel Erectors, Inc.*, OSHRC Docket No. 703, 1973-74 CCH-OSHD, ¶ 17,136 (January 10, 1974). In addressing the conflicting obligations which may arise from the tension between the general duty clause and an individual standard — particularly where the latter may be more hazardous than the employment practice actually followed — the Commission observed:

> "... While concededly employers have an obligation to comply with applicable standards, in a given situation, we do not read section [654] so literally as to require a form of compliance that will diminish rather than enhance the safety of the employees. ... Employees and employers alike should not be required to comply with a standard so sedulously as

to follow a course of conduct that is shown by the weight of the evidence to be less safe than an existing work practice.

"This is not to say that the standards adopted by the Secretary are not substantive rules having the force and effect of law. But in our view an exception to the requirements . . . must be implied to permit a condition of greater safety or health to prevail in the workplace than is possible under a standard that has general application."

In considering the argument that Industrial Steel Erectors should have obtained a variance, the Commission noted that this is the appropriate procedure, particularly if the employer desires a declaratory judgment type of pre-enforcement relief. It could be argued that an employer, however, may also proceed *at his own risk* without a variance, chancing that he can prove his action to be justified in a subsequent enforcement proceeding. *Accord, Secretary of Labor v. Cleveland Wrecking Co.*, OSHRC Docket No. 1359, 1973-74 CCH-OSHD, ¶ 18,231 (July 10, 1974); *Secretary of Labor v. J. H. Baxter & Co.*, OSHRC Docket No. 2043, 1973-74 CCH-OSHD, ¶ 16,315 (July 18, 1973). We need not, however, reach this question.

Here, the Commissioner, having noted the uncontroverted evidence that the guardrails (on three sides), the midrails, and the toe boards were not in place, rejected the argument that compliance with (i)(11) would have created a hazard. He was also of the view that this claim should have been presented by an application for a variance. Although there was testimony from which the Commissioner could have found that front guardrails would have created a hazard, he was not compelled to reach this conclusion. There was also testimony from which he could have determined that the painters merely found front guardrails an inconvenience rather than a hazard.

Confronted with these alternative possibilities, it was not inappropriate for the Commissioner to reason that the employer should have sought relief before the fact, rather than risk that it could prove its course of conduct to be

justified in some future enforcement proceeding. This reasoning is reinforced by the fact that the employer had been cited for the identical violation just weeks before — when a fatality also resulted — and had neither contested the charge nor taken any corrective action. That, under these conditions, the Commissioner took a jaundiced view of the increased hazard claim made by the employer is understandable. In any event, these circumstances coupled with the uncontroverted evidence respecting the guardrails readily furnished the substantial evidence necessary to support the findings of the Commissioner, and the circuit court properly affirmed them.

(3)

The $3,000 Civil Penalty

Apart from the violation of (i) (11) itself, the employer also attacks the $3,000 civil penalty imposed by the Commissioner. It contends that he failed to observe the necessary criteria prescribed by the statute, and that, in any event, there was insufficient evidence to permit him to do so. We do not agree. Section 40 (f) of Art. 89 states:

> "The Commissioner shall have the authority to assess all civil penalties set forth in this subtitle giving due consideration to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the employer's history of previous violations."

We think that there is sufficient evidence to support the imposition of the penalty. Two preliminary observations are in order. First, the violation was found to be both "repeated" and "serious," and there is no contention by the employer that the evidence fails to support this determination, or to come within the statutory definition of those terms. For this purpose, it is sufficient to state that a "serious" violation essentially is one where "there is a substantial probability that death or serious physical harm could result." § 40 (b). Secondly, for a repeated violation, "a civil penalty not to

exceed $10,000" may be assessed. § 40 (a). The penalty imposed here, therefore, was well below the maximum limit for such a violation.

With respect to the criteria themselves, although, as argued by the employer, there is no evidence of the gross dollar volume of this contract, no such requirement appears in the statute. The evidence showed a range of between 50 and 60 men working on the bridge for this particular employer. This fact, coupled with the evidence that the employer, whose main office was in New Jersey, had handled construction jobs on the same magnitude as the bay bridge in a number of other states, was sufficient to show the size of its business within the contemplation of the statute.

In respect to the other statutory criteria, little need be said. That a fatality occurred — for the second time — is testimony to the "gravity of the violation." The Commissioner expressly determined in regard to (i)(11) that the employer had not acted in "good faith" — one of the remaining criteria — ample support for which may be found in its failure to take any remedial action after the prior tragedy. The final consideration to be met under the penalty provision — "history of previous violations" — speaks for itself in this case.

Contrary to the argument advanced by the employer, the statutory criteria were properly recognized by the Commissioner, and were supported by substantial evidence. Hence, we will not disturb the penalty imposed by him.

*Judgment reversed in part, affirmed in part, as herein set forth; as to that part reversed, remanded to Circuit Court for Queen Anne's County with directions to reverse the decision of the Commissioner of Labor and Industry; costs to be equally divided between the parties.*

*Singley, J., concurring:*

I concur in the result reached by the majority only because the constitutionality of the civil penalty imposed under Maryland Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.), Art. 89, § 40, was not challenged by the appellant. *See,* Maryland Declaration of Rights, Article 8; Constitution, Article IV, § 1.

Judge Smith has authorized me to say that he joins in this concurrence.