664 A.2d 411

**MARYLAND COMMISSIONER OF LABOR AND INDUSTRY**

v.

**BETHLEHEM STEEL CORPORATION.**

No. 1800, Sept. Term, 1994.

Court of Special Appeals of Maryland.

Sept. 5, 1995.

---

10. On the record of this case, we do not decide whether such a delegation, if proven, would have been proper.

244

**246**

248

Jonathan R. Krasnoff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Eric Hemmendinger (Earle K. Shawe and Shawe & Rosenthal, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and WENNER and DAVIS, JJ.

WENNER, Judge.

Appellant, Commissioner of Labor and Industry (Commissioner), appeals the judgment of the Circuit Court for Baltimore County reversing the Commissioner's decision that appellee, Bethlehem Steel, was guilty of a repeated, serious violation of the Maryland Occupational Safety and Health Act (MOSHA). On appeal, the Commissioner asks:

Did the Circuit Court err in reversing the Commissioner's finding that Bethlehem Steel engaged in a violation of 29 C.F.R. § 1910.303(b)(1) that was both serious and repeated?

Responding in the affirmative, we shall vacate the judgment of the circuit court and remand the case to that court with instructions to remand it to the Commissioner for further proceedings consistent with this opinion.

## FACTS

We begin by noting that the facts are undisputed. On 17 August 1990, an employee was electrocuted. The accident occurred in a room provided by Bethlehem Steel for its employees to take a break and cool off from the intense heat in which they had been working. While there, the decedent sat next to a portable cooling unit and rested his arm on a toaster oven that was sitting on the cooling unit. At some point, the decedent's leg came into contact with the metal casing of the cooling unit, creating a circuit for the shock that electrocuted him.

The toaster oven was later determined to be the cause of the accident. The oven was in extremely poor condition, having duct tape wound around it to keep it together. It was later discovered that one of the oven's heating elements was touching the oven's metal casing, which allowed electricity to surge through the oven's exterior skin. When the decedent came into contact with both the oven and the cooling unit, electricity from the oven surged through and killed him.

An unknown employee had brought the toaster oven into the break room some three years prior to the accident. Over the course of time, as the oven continued to deteriorate, the employees took stop gap measures, such as wrapping it in duct tape, to keep it working. The employees were the only ones who used the oven and were principally the only ones who used this particular break room. Supervisors regularly entered the room to post work related notices on the bulletin board but did not otherwise use the facility. Apparently, the toaster oven had been shocking employees for several weeks prior to the fatal accident; however, none of the incidents were reported to the supervisors, nor were any measures taken by the employees to repair or replace the oven. Instead, they continued to use it until it electrocuted their co-worker.

Soon after the accident, a MOSHA inspector investigated the incident and determined that the toaster oven was capable of providing the electrical surge that killed the employee. The inspector found that the heating element inside of the oven had become dislodged, so that it was in contact with the oven's outer metal casing. Apparently, to no avail, someone had previously attempted to insulate the displaced element. When asked why the inspector had issued citation No. 1 charging Bethlehem Steel with having violated 29 C.F.R. § 1910.303(b)(1),[1] the inspector responded that

anybody that was looking at it [the oven] could have observed that it needed to be attended to, and I say this because there was tape wrapped around the outside of it. It appeared to be in high volume use. Even though we don't know whether the high volume use was over a short period of time or a long period of time, it still was suggested that it needed some attention and presented possibly recognized hazards.

---

1. 29 C.F.R. § 1910.303(b)(1) provides:
 Examinations, installations, and use of equipment—(1) Examination. Electrical equipment shall be free from recognized hazards that are likely to cause death or serious physical harm to employees.

The inspector further qualified the violation as a repeat violation because Bethlehem Steel had been previously cited under the same general safety standard for electrical equipment. On cross-examination, the inspector admitted that the oven's dislodged heating element could not have been observed from the exterior of the oven.

The matter was heard before an Administrative Law Judge (ALJ) who rescinded citation No. 1, concluding:

> As correctly pointed out in the EMPLOYER's Brief, the EMPLOYER is charged with a violation of a Standard 29 C.F.R. § 1910.303(b)(1) which addresses electrical safety requirements as they pertain to the *installation* of electrical equipment and does not deal with the subsequent maintenance or inspection of electrical equipment.
>
> Not only is this interpretation apparent from the cited standard itself, but it was admitted to in his testimony by MOSHA Inspector Barry. His testimony also confirmed that OSHA standards, pertaining to electrical equipment maintenance, have not yet been issued and therefore are not presently enforced.

Thus, the ALJ concluded that MOSHA had not met its burden.

The Commissioner reversed the ALJ's decision, determining that, as a matter of law, the ALJ had misinterpreted 29 C.F.R. § 1910.303(b)(1). The Commissioner went on to conclude that the oven presented a hazard, that Bethlehem Steel had constructive notice of the hazard, and that the consequent violation constituted a serious repeated violation. The Commissioner arrived at that conclusion because Bethlehem Steel had been previously cited for violating 29 C.F.R. § 1910.303(b)(1), though the circumstances of those incidents differed greatly from those presently under consideration.

Bethlehem Steel then noted an appeal to the Circuit Court for Baltimore County, arguing that the Commissioner erred by finding that the oven was "equipment" covered by the OSHA standard, and by concluding that the violation was a repeated serious violation. The circuit court concerned itself only with the latter contention and concluded that the evi-

dence before the Commissioner was not sufficient to support the Commissioner's decision that the charged violation was a repeated serious violation.

## STANDARD OF REVIEW

 The scope of judicial review of an agency's decision is set out in Md.Code (1974, 1991 Repl.Vol.) § 5–212(c) of the Labor and Employment article, which provides:

(c) Scope of review.—(1) The court shall determine whether an order that the Commissioner passes under this title or regulation that the Commissioner adopts to carry out this title is in accordance with law.

(2) If a finding of the Commissioner on a question of fact is supported by substantial evidence, the finding is conclusive.

(3) A regulation that the Commissioner adopts to carry out this title: (i) shall be deemed prima facie lawful and reasonable; and (ii) may not be held invalid because of a technical defect if there is substantial compliance with this title.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ... [and] review is limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 513, 390 A.2d 1119 (1978). Moreover, our review of the Commissioner's factual findings is limited because those findings are presumed to be correct. Consequently, we may not substitute our judgment for that of the Commissioner. *Id.* at 514, 390 A.2d 1119. No such deference is accorded if the Commissioner's decision is not in accordance with the law.

## DISCUSSION

### I.

### Applicability of the Standard

 We begin by addressing whether the MOSHA standards are applicable to the toaster oven here involved. We note that the specific ownership of the toaster oven is irrele-

vant. It is enough to recognize that the appliance was not supplied by the employer, it having been brought into the breakroom and owned by an employee and used or available for use by all of the employees using the breakroom. We must determine the extent of an employer's responsibility to provide its employees with a safe workplace. Although the trial court failed to address this issue, as it was raised below by Bethlehem Steel, we may address it on appeal. *See Offutt v. Montgomery County Bd. of Educ.*, 285 Md. 557, 564, 404 A.2d 281 (1979).

> The crux of Bethlehem Steel's argument is that
> [i]t would come as a considerable surprise to Maryland employers to learn that they are responsible not only for their own equipment, but also for ensuring that all the various hot plates, immersion coils, radios, space heaters, lamps, fans, televisions, toaster ovens, microwave ovens, electric clocks, etc., that people bring to work comply with MOSHA standards relating to industrial equipment.

Therefore,

> [n]either the standard, nor MOSHA's previous enforcement of it, provide the type of notice to which Bethlehem was entitled in this case, and to which all employers are entitled for future reference.

Of course, Bethlehem Steel is quite correct that notice is at the heart of the matter. MOSHA regulations were not intended to make employers strictly liable for any hazardous conditions existing at a particular work site. *J.I. Hass Co., Inc. v. Dep't. of Lic. and Reg.*, 275 Md. 321, 340 A.2d 255 (1975). Rather, the purpose of the MOSHA is to ensure that employees are provided with a safe work place. Thus, the MOSHA regulations must provide an employer with adequate notice of the hazards and conditions that must be eliminated. Nevertheless, it would have been helpful had Bethlehem Steel presented us with an argument to this effect, rather than simply mentioning "notice" at the conclusion of its argument.

In reply, we are urged by the Commissioner to follow the decisions of the Federal Occupational Safety and Health Re-

view Commission (OSHRC). OSHRC has consistently upheld sanctions against employers for hazards created by employee-owned devices. For example, the Commissioner directs us to *Chicago and North Western Transportation Company*, 5 O.S.H. Cas. (BNA) 1121 (R.C.1977), in which the OSHRC said:

> Respondent contends, however, that because the fan was privately owned by an employee who used it for his own comfort, responsibility for the presence of the unguarded fan cannot be placed upon the respondent. We reject this argument. An employer is responsible for ensuring the safety of equipment it owns and provides to employees. An employer is equally responsible for ensuring the safety of equipment over which it has control, but no ownership, that is used by its employees. *Id.* at 1122–1123.

Moreover, in *Porter Plastics, Inc.*, 8 O.S.H. Cas. (BNA) 1933 (R.C.1980), the OSHRC recognized that their "precedent holds that an employer is responsible for ensuring the safety of equipment over which it has control but not necessarily ownership." *Id.*

We think it is clear that ownership is not, nor should it be, the determinative factor in cases involving appliances brought into the workplace by employees. To conclude otherwise would be in direct conflict with the intent of the general duty clause contained in Md.Code (1974, 1991 Repl. Vol.) Title 5, Subtitle 1, § 5–104(a) of the Labor and Employment Article, which requires that "[e]ach employer shall provide each employee of the employer with employment and a place of employment that are: (1) safe and healthful. . . ." We think that this makes it clear that the employer is generally responsible for the workplace, and not just for those items that are provided the employees by the employer. The place of employment is under the direct control of the employer. Moreover, as we have recognized,

> [a]n employer must take reasonable precautionary steps to protect its employees from reasonably foreseeable recognized dangers that are causing or are likely to cause death or serious physical injury.

*Mardo Homes, Inc. v. Commissioner,* 35 Md.App. 260, 267, 370 A.2d 144 (1977). Therefore, we conclude that employers may be held responsible for hazardous appliances brought into the workplace, even though the employer neither owns nor brought them there. Nevertheless, we must still determine under what circumstances a hazardous appliance may be deemed to be under the employer's control, though not owned or provided by the employer.

■ It is readily apparent in both *North Western* and *Porter Plastics, Inc.,* that the hazardous equipment was not owned or provided by the employer, but it was in the workplace and any of the employees could come into contact with it. For example, in *North Western,* the employer was cited for violating 29 C.F.R. § 1910.212(a)(5), which in pertinent part provides:

> When the periphery of the blades of a fan is less than seven (7) feet above the floor or working level, the blades shall be guarded. The guard shall have openings no larger than one-half (½) inch.

An investigation revealed that a portable electric fan owned personally by an employee had unguarded blades and was positioned less than seven feet above the floor, where an employee could come into contact with its blades.

In *Porter Plastics,* the employer was cited for violating 29 C.F.R. 1910.215, which in pertinent part provides:

> Abrasive wheels shall be used only on machines provided with safety guards as defined in the following paragraphs of this section.

An employee had brought a portable grinder personally owned by him to his place of employment. Though the employee had placed a "Do Not Use" tag on the grinder, it was used by other employees without affixing a guarding device to it.

■ We recognize that it is common for employees to bring to the workplace a great variety of personal items for their use or for the adornment of the workstation, some of which may be mechanical or electrical. It would be an undue burden to make the employer responsible for all of those

personal items. But we do not agree with Bethlehem Steel's assertion that the employer is responsible for none of them. Some of those items that are readily available to and used by other employees become part of the workplace environment and can affect the safety of that environment. We think a practical standard would be that the employer would not be responsible under the Maryland OSHA for personal items brought to the workplace by an employee for the exclusive personal use by that employee if the employer has no actual or constructive knowledge that the item is being used by or is available for or used by other employees. Falling within that exception would be such things as desk lamps, desk clocks, radios, and other common workplace accessories that other employees would ordinarily recognize as being for the personal use and under the owner's personal control and not for the common use or operation by other employees.

In the present case, although Bethlehem Steel did not own the toaster oven, it is responsible for the safety of the workplace and the appliances and tools used by the employees. Through its supervisory personnel, Bethlehem Steel was, or should have been, aware that the toaster oven was an electrical appliance, that it was in an area of the workplace, and that it was thus available for use and was likely used by a number of employees. We therefore conclude that the MOSHA regulations are here applicable.

In addition, Subpart S of 29 C.F.R. addresses "electrical safety requirements that are necessary for the practical safeguarding of employees in their workplaces." 29 C.F.R. § 1910.301. Section 1910.302(b)(1) makes it clear that "[t]he requirements contained in the sections listed below shall apply to all electrical installations and utilization equipment, regardless of when they were designed or installed." Unlike the penalty provision discussed below, the regulation discussed here is entitled to be construed liberally. Consequently, its broad language covers all electrical devices used in the workplace. It is apparent from the record that the breakroom was supplied by Bethlehem Steel for the employees' use and that

the toaster oven was available to all employees who entered the breakroom. As the breakroom was under Bethlehem's control, we conclude that 29 C.F.R. 1910.303(b)(1) applied to the toaster oven.

## II.

### Serious and Repeated Violations

 The Commissioner asserts that its findings of a repeated and serious violation were correct. Whether the violation at issue is serious, and whether it constituted a repeated violation, are independent and distinct issues that must be separately addressed. In addressing them, we are guided by federal cases interpreting the Occupational Safety and Health Act (OSHA). *J.I. Hass Co. v. Dep't. of Lic. and Reg., supra,* at 330–331, 340 A.2d 255. As we have noted, after conducting a hearing on Bethlehem Steel's appeal, the circuit court concluded that Bethlehem Steel's violation was neither serious nor repeated.

### Serious Violation

 Pursuant to Maryland Code (1957, 1989 Repl.Vol.), Art. 89, § 40(b),

[a] serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm would result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment, unless the employer did not, and could not with the exercise of reasonable diligence, know the presence of the violation.

As an electrical shock is a potentially lethal hazard, the issue here is whether Bethlehem Steel, by exercising reasonable diligence, could or should have known of the presence in the employees' breakroom of a deteriorating toaster oven. Applying the reasonable diligence standard to the facts before us, the Commissioner concluded that the "tape [wrapped around the oven] served as a signal of deterioration or damage and,

given that the device was electrical in nature, such a signal warrants further examination." On appeal, the circuit court disagreed with the Commissioner's conclusion because the use of duct tape wrapped around the oven could have indicated that there was no electrical hazard. As we said earlier, judicial review of an administrative decision is limited to determining whether the decision was supported by substantial evidence, not whether the reviewing court would have, or could have, reached a different conclusion. Here, the toaster oven appeared to be dilapidated, and the Commissioner further concluded that the toaster oven was "in plain view of supervisors who entered the breakroom on a regular basis to post job assignments and obtain ice." Based upon this evidence, the Commissioner concluded that the dilapidated appearance of the toaster oven, including the duct tape in which it was wrapped and the carbon build-up, was sufficient to warrant a further examination by a reasonably diligent employer. While we conclude that the circuit court erred by supplanting its conclusion for that of the Commissioner, on remand we point out to the Commissioner that the agency has the burden of proving that the employer knew or should have known of the hazard through reasonable diligence.

### Repeat Violation

At the time of the fatal accident, the civil penalties for repeatedly violating an OSHA standard were contained in Maryland Code (1957, 1985 Repl.Vol.) Article 89, § 40, which provides:

> (a) Willful or repeated violations.—Any employer who willfully or repeatedly violates any provision of this subtitle may be assessed a civil penalty not to exceed $10,000.00 for each violation.

Unfortunately, the term "repeatedly" is not further defined in either MOSHA or OSHA. Nor does the federal case law provide us with a clear definition. There are essentially two lines of thought concerning "repeated" violations.

In *Bethlehem Steel Corp. v. O.S. & H.R. Comm'n,* 540 F.2d 157 (3rd Cir.1976), the Third Circuit rejected the OSHRC's

decision "that a 'repeated' violation occurred when the same regulation was violated for a second time, though the two violations were not factually identical." *Id.* at 159. The court began its analysis by defining "repeatedly."

> Our starting point is with the word "repeatedly" itself, though the meaning of a word in a statute cannot be determined in isolation. Webster's Third Edition does not define "repeatedly," but it states that the word is the adverbial form of the adjective "repeated." That adjective is defined as follows:
>
> > 1: renewed or recurring again and again: constant, frequent [-absences] [—mistakes] [—changes of plan]
> >
> > 2: said, done, or presented again [an often—excuse] [an eloquently—speech] [an easily—pattern]
>
> The usage examples given by the dictionary for the first definition can easily be converted to examples of the use of "repeatedly" while retaining the sense of the original phrase—e.g., "he is absent repeatedly." The usage examples given for the second definition cannot be so altered. This is illustrated by the following sentences:
>
> > It is a repeated speech.
> >
> > It is an often repeated speech.
> >
> > It is a speech made repeatedly.
>
> The first sentence uses "repeated" in the sense of the dictionary's second definition—the speech has been given before, perhaps only once before. Adding the adverb "often" to modify the adjective "repeated" makes the second sentence mean "the speech is given many times." The third sentence shows that "repeatedly is the equivalent of "often repeated," or, in other words, the plain and ordinary meaning of the word "repeatedly" is "constantly, frequently."

The Third Circuit thus first determined that the enhanced penalties to be imposed for repeated violations may not be assessed for a single re-occurrence of a violation. The court went on to say that enhanced penalties are "directed at particularly flagrant conduct, and therefore the objective con-

duct which 'repeatedly' encompasses must be similar to that which would raise an inference of willfulness." *Id.* at 162.

> Among the factors the Commission should consider when determining whether a course of conduct is flaunting the requirements of the Act are the number, proximity in time, nature and extent of violations, their factual and legal relatedness, the degree of care of the employer in his efforts to prevent violations of the type involved, and the nature of the duties, standards, or regulations violated. *Id.*

The Third Circuit reversed OSHRC's decision because only one prior violation had occurred.

In the case *sub judice,* the Commissioner relied on *Potlach Corp.,* 7 O.S.H. Cas. (BNA) 1061 (R.C.1979). In *Potlach,* the OSHRC took an approach contrary to that of the Third Circuit. *Potlach* marked the first time that a majority of the OSHRC agreed upon a definition of "repeatedly" and the procedure for determining what conduct rose to the level of "repeatedly." According to *Potlach,* a standard has been repeatedly violated "if at the time of the alleged repeated violation, there was a Commission final Order against the employer for a substantially similar violation," *Id.* at 1063, and set out a two-step procedure to be applied by the hearing authority. The agency must first establish a prima facie case that a violation is a repeat violation. To do so, it need only show that the prior and present violations are for violating the same regulatory standard (e.g., 29 C.F.R. § 1910.303(b)(1)).[2] After a prima facie case has been established, the burden then shifts to the employer to rebut the prima facie case with "evidence of the [dissimilarity of the] conditions and hazards associated with these violations of the same standard." *Bunge Corp. v. Secretary of Labor,* 638 F.2d 831, 837 (5th Cir.1981) (quoting *Potlach Corp., supra.*).

---

**2.** Because the present case concerns only alleged repeated violations of a single general standard, we shall not address the situation where different regulations are violated, though the actual violations are substantially similar.

The *Potlach* decision was modified by the Fifth Circuit in *Bunge Corp. v. Secretary of Labor, supra.* Although accepting the *Potlach* definition of "repeatedly," the *Bunge* court substantially rejected the remainder of *Potlach.* Most importantly, the *Bunge* court rejected the notion that the agency need establish only a prima facie case in order to shift the burden to the employer, recognizing that in an administrative proceeding, the burden of proof is properly on the proponent of a rule. *Bunge, supra; see also Carbon v. Physical Therapists Examining Bd.*, 242 A.2d 835 (D.C.1968). The *Bunge* court went on to say that the similarity between violations must be determined from the hazard or condition contained in the standard, and opined that an employer will receive the required notice of a potential repeat violation only if the prior and subsequent citations include substantially similar hazards or conditions. In other words, citations may not be substantially similar when issued for wholly disparate hazards, or conditions.

■■■■■ We believe that a combination of the two approaches will best serve the legislative intent behind these regulations. Although we do not adopt the Third Circuit's brightline test of "more than two violations," we agree with the Third Circuit that use of "repeatedly" as an alternative to "willfully" indicates the legislature's intent to penalize more severely those employers who knowingly allow substantially similar violations to occur again. It should be noted that the term "violation" as used in this context means violations for which citations are issued and adjudged against an employer. The citation places the employer on notice that the occurrence of another substantially similar violation may lead to the enhanced penalties provided under Maryland Code (1957, 1985 Repl.Vol.) Article 89, § 40.

■■■■■ Even though 29 C.F.R. § 1910.303(b)(1) is civil rather than criminal, it allows the imposition of severe penalties and should be strictly construed. While we do not agree with the Third Circuit that the employer's conduct *must* rise to a level raising an inference of willfulness, which blurs the

alternative nature of the two concepts, we do not think that a penalty should be enhanced by a factor of ten for a subsequent inadvertent or dissimilar violation. *George Hyman Construction Co. v. OSHARC,* 582 F.2d 834 (4th Cir.1978). Enhanced penalties serve a purpose. Here, that purpose is to punish and deter those employers who carelessly allow continued violations of a similar nature. Realizing that "willfulness" may be difficult to prove, the Legislature added "repeatedly," as an alternative basis for culpability. It is important to recognize, however, that the statute does not specify that a second violation must receive the enhanced penalty. If the Legislature had so intended, it could easily have done so.

 Moreover, we reject the notion that a second violation cannot constitute a "repeated" violation. There is nothing in the statute to justify such a holding. A finding that a violation is a "repeated" violation first requires a finding of at least one violation and an additional violation. It also requires a sufficient similarity of the current violation to the earlier violation, to give the employer fair notice of the hazard.

 There is no specific number of violations for determining when an employer has "repeatedly" violated the MOSHA regulations. Rather, the number of subsequent violations is one factor to be considered in determining whether imposing an enhanced penalty is warranted. We agree with the *Bunge* court that citations must contain substantially similar hazards and conditions to be used for determining whether a standard has been repeatedly violated. By requiring such similarity, imposition of the enhanced penalty will serve to highlight a specific failing in the employer's oversight and control.

 In the instant case, the circuit court did not address whether the Commissioner was legally correct. It merely assumed that the Commissioner cited the appropriate legal standard. In Maryland, "the burden of proof is generally on the party asserting the affirmative of an issue before an administrative body." *Bernstein v. Real Estate Comm.,* 221 Md. 221, 231, 156 A.2d 657 (1959). Moreover, in an adminis-

trative proceeding the burden of proof is correctly placed upon the proponent of a rule. *Bunge, supra; see also Carbon v. Physical Therapists Examining Bd., supra.* As the *Bunge* court put it, the burden to prove the substantial similarity between prior and subsequent violations lies squarely upon the agency, and may not be shifted to the employer.[3] This is equally true in Maryland. Unless the statute provides otherwise, the burden of proving that a MOSHA standard has been repeatedly violated lies with the agency. The concept of "repeatedly" embodies two overlapping but distinct matters. The first has to do with how many prior violations of a standard have occurred. The second is the degree of similarity between the prior and the latter incidents, such that the employer was on notice of the hazard and/or condition leading to the subsequent violation. A finding of substantial similarity between the violations is necessary before enhanced penalties may be sanctioned for a "repeated" violation.

On remand, the Commissioner must decide whether more than one citation had been issued for substantially similar violations. Although there is some confusion as to how that determination should be made, we note that it may be explained in terms of the nature of the citations and character of the standard, or standards, involved. As was said in *Potlach,* if the standard is a general standard, such as 29 C.F.R. § 1910.303(b)(1), then it will be easier to distinguish between the violations, or to demonstrate their dissimilarity. If the employer is cited for violating the same specific standard, then the violations will necessarily be closely related and the violations may be difficult to distinguish from one another. *Bunge, supra.* at 837. According to *Bunge,* "When the violative elements are both condition and hazard, the citations must have both substantially similar conditions and substantially similar hazards." *Id.* at 837, n. 9. We caution the Commis-

---

3. While we are aware of the Court of Appeals' recent decision in *Bethlehem Steel Corporation v. Commissioner of Labor and Industry,* 339 Md. 323, 662 A.2d 256 (1995) (Rodowsky, Judge), we note that the decision concerns general rather than specific standards, but not repeated violations.

sioner to keep in mind that the similarity of two violations is determined from the facts underlying the citation, not the similarity in section numbers.

These factual determinations must be fully addressed by the Commissioner without the aid of the *Potlach* shortcuts. As those issues were not addressed by the Commissioner, the Commissioner's decision must be reversed.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND IT TO THE COMMISSIONER FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLANT.**