Dear Senator Boozer:
You have requested our opinion whether State law precludes enforcement of a Baltimore City ordinance requiring operators of certain construction equipment to obtain a license from a City board. Specifically, you ask whether State law has preempted the field of "occupational safety of power equipment operations, including training and licensing," so that Baltimore City was precluded from enacting legislation requiring the licensing of power equipment operators. Alternatively, you ask whether the Baltimore City ordinance conflicts with State law.
Our opinion is that State law has preempted the field of occupational safety and health. Therefore, the City ordinance, which imposes licensing as an occupational safety requirement for operators of construction equipment, is invalid. In light of this conclusion, we need not consider whether the City ordinance conflicts with State law.
 I Background
A. State Law on Training for Power Equipment Operators
In the 1989 Session of the General Assembly, several Senators introduced Senate Bill 786, to provide for the regulation of power equipment operators by requiring an operator to obtain a license from a State board. Senate Bill 786 was not the first bill introduced to address the licensing and regulation of power equipment operators. Senate Bill 689, introduced in 1988 Session, also provided for the licensing of power equipment operators. The bill received an unfavorable report from the Senate Economic and Environmental Affairs Committee. Senate Bill 786 likewise did not pass. Instead, it was referred for summer study.
A substantially revised bill, Senate Bill 586, emerged in the 1990 Session as a result of the summer study. Senate Bill 586 did not contain a licensing requirement, a cornerstone of the previous Senate bill. Rather, the emphasis of Senate Bill 586 was on employer training of power equipment operators. As the sponsor put it in her testimony, "SB 586 does not license power equipment operators. It requires . . . the Commissioner of Labor and Industry, in consultation with involved parties, to adopt regulations for the safe use of power equipment and prepare a model training program." Testimony by Senator Paula C. Hollinger on SB 586 before the Senate Economic and Environmental Affairs Committee. Senate Bill 586 was enacted as Chapter 481 of the Laws of Maryland 1990.
Chapter 481 was added to the Maryland Occupational Safety and Health Act, which is now codified as Title 5 of the Labor and Employment Article Maryland Code. LE Title 5, Subtitle 5 sets forth the framework for the training of operators of "power equipment," a term encompassing large pieces of construction equipment like backhoes and bulldozers. LE § 5-501(c). The Commissioner of Labor and Industry ("Commissioner") is directed to develop a model training program, education programs on safety training, a format for collecting statistics on accidents, and a methodology for ascertaining the causes of serious accidents. LE § 5-502. The Commissioner is also authorized, in consultation with the Advisory Committee on Safety Training Programs for Power Equipment Operators, to adopt regulations.[1] Of particular importance for this opinion, LE § 5-506 provides as follows: "This subtitle may not be construed to allow or require licensing, registration, or certification of an operator of power equipment."
B. Baltimore City Ordinance on Licensing of ConstructionEquipment Operators
In 1991, the Baltimore City Council enacted Ordinance 787, addressing the licensing and regulation of "construction equipment" operators. The definition of "construction equipment" in the ordinance is identical to the definition of "power equipment" in LE § 5-501(c).
The purpose of the ordinance is to require operators of certain construction equipment to obtain a license to operate construction equipment on a construction site in Baltimore City. The ordinance establishes a comprehensive licensing procedure, including operator qualification requirements, application and examination procedures, and renewal and revocation methods, all to be overseen by a City board created for the purpose. The ordinance does not address the training of the operators of construction equipment. Like the failed bills introduced in the General Assembly in 1988 and 1989, the centerpiece of the Baltimore City ordinance is operator licensing, not employer training.
Ordinance 787 surely reflects the kind of exercise of police power that would ordinarily be within Baltimore City's prerogative as a home rule jurisdiction. Moreover, ordinarily Baltimore City may supplement State regulation with its own, more stringent regulation. Mayor of Baltimore v. Sitnick, 254 Md. 303,255 A.2d 376 (1969). However, the City may not exercise its police power in an area preempted by State law.
 II Preemption Analysis
A. Introduction
Preemption is premised upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field. See Ad + Soil, Inc. v. County Comm'rs, 307 Md. 307, 324,513 A.2d 893 (1986). The doctrine of preemption prevents local legislative bodies from enacting legislation in a preempted field.
"[T]he primary indicia of legislative purpose to pre-empt an entire field of law is the comprehensiveness with which the General Assembly has legislated [in] the field." Allied Vending,Inc. v. City of Bowie, 332 Md. 279, 299, 631 A.2d 77 (1993) (internal quotation marks and citations omitted). Examples of such comprehensive regulation of a field may be found in CountyCouncil v. Montgomery Ass'n, Inc., 274 Md. 52, 333 A.2d 596 (1975) (conduct and regulation of elections); McCarthy v. Board ofEducation, 280 Md. 634, 374 A.2d 1135 (1977) (public elementary and secondary education); and Allied Vending
(sale of cigarettes through cigarette vending machines).[2]
The case most nearly on point is Talbot County v. Skipper,329 Md. 481, 620 A.2d 880 (1993), which involved regulation of sewage sludge utilization — in particular, whether a county could require certain sludge application permits to be recorded in the land records. This area of environmental regulation, requiring sophisticated judgments about safety and cost-effectiveness, is analogous to the area of occupational safety.
In holding that State law governing sewage sludge utilization impliedly preempted the field, the Court of Appeals first noted the General Assembly's enactment of "a very comprehensive scheme regulating all aspects of sewage sludge utilization in Maryland."329 Md. at 489. In particular, the Court pointed to statutory provisions directing "the Department of the Environment to adopt regulations governing utilization of sewage sludge . . . and contain[ing] numerous subsections detailing considerations which the Department [of the Environment] must address when drafting its regulations." Id. The Court characterized these and other provisions as manifesting "the general legislative purpose to create an all-encompassing State scheme of sewage and sludge regulation." 329 Md. at 491.[3] The Court found particularly significant the fact that the General Assembly had rejected the very requirement (recording of sewage sludge permits in local land records) imposed by the local ordinance. 329 Md. at 493. In addition, the Court pointed out that the permit recording requirement of the local ordinance "is not a traditional type of local government regulation. It is not the type of local ordinance which the General Assembly, if it intended preemption, would have been expected to have expressly disallowed." Id.
B. Implied Preemption by the MOSH Act
All of these elements have their parallel in the State regulatory scheme for occupational safety and health. First, State law provides for the pervasive administrative regulation of the field. In 1973, the General Assembly enacted the Maryland Occupational Safety and Health Law ("MOSH" Act" or "Act"). The MOSH Act essentially tracks the federal Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., and authorizes the Commissioner to adopt occupational safety and health standards, establish duties for employers and employees, issue citations, and undertake enforcement procedures. See J. I. Hass Co. v. Dep't ofLicensing and Regulation, 275 Md. 321, 327, 340 A.2d 255 (1975). The MOSH Act provides that Maryland's occupational safety and health standards are to be "at least as effective in providing safe and healthful employment and places of employment as any standard adopted under the federal Occupational Safety and Health Act of 1970." LE § 5-309(a)(1).[4] The legislative policy section of the MOSH Act states that "[t]he purposes of this title are to ensure, to the extent practicable, that each working man and woman in the State has working conditions that are safe and healthful and to preserve human resources . . . ." LE § 5-102(b). The policy section also refers to the adoption of safety and health standards, training requirements, compliance and enforcement programs, reporting requirements, and education programs. Id. The Act provides that, with the exception of employees covered by three federal laws, it applies to the "working conditions at each work place in the State." LE § 5-103(a).
Pursuant to the MOSH Act, the Commissioner has adopted comprehensive regulations in the occupational and safety field, including the incorporation by reference of federal regulations.See COMAR 09.12.31. We conclude that the comprehensiveness of the MOSH Act manifests a general legislative purpose to create an all-encompassing State scheme over occupational safety and health. The oversight of power equipment operators is included within this pervasive scheme. This all-encompassing scheme is strong evidence of a legislative intent to preempt the entire field, to the exclusion of local legislation. See Talbot County v. Skipper,329 Md. at 491.
An examination of other factors also supports the conclusion that the General Assembly intended to preempt local authority to require licensing as a means of promoting occupational safety and health.[5] The licensing and training of power equipment operators is specifically addressed by State law. LE 5-505
provides that "[t]his subtitle may not be construed to allow or require licensing, registration or certification of an operator of power equipment." As discussed in Part IA above, the legislative history of LE § 5-505 demonstrates that the General Assembly considered the licensing of operators during two legislative sessions but ultimately rejected the idea. This history is at least as telling as the legislative history found significant inSkipper.
There is no concurrent legislative authority over occupational safety and health granted to local jurisdictions.Cf. Ad + Soil, Inc., 307 Md. at 327 (legislation manifests a general policy of fostering local control under State supervision, including references in statute to concurrent legislative authority of local jurisdictions). In fact, we were not able to find any other local legislation in the field of occupational safety and health.
The General Assembly's failure to foresee and expressly prohibit local legislation of the licensing of power equipment operators does not validate the Baltimore City ordinance. The State adopted its comprehensive scheme addressing occupational safety and health over twenty years ago and enacted the subtitle on training of power equipment operators prior to the enactment of the City ordinance. Therefore, we are not presented with a preexisting local ordinance. In addition, the field of occupational safety and health has not traditionally provided for local control, nor has the Commissioner recognized local authority to act in the field.
C. Conclusion
Safety in the workplace is a goal that might be sought by a variety of substantive approaches. The approach typically reflected in the Commissioner's regulations is the incorporation of a detailed federal specification of workplace requirements and prohibitions. See, e.g., COMAR 09.12.31.P-1. These regulations are in furtherance of the statutory directive that regulatory standards be expressed "in terms of objective criteria and desired performance." LE § 5-309(c)(2).
A second approach, more a cumulative than an alternative form of regulation, is a specification of training procedures, aimed at achieving greater compliance with proper workplace practices. This regulatory approach is reflected not only in LE Title 5, Subtitle 5, the focus of this opinion, but also in the Commissioner's statutory duty to "provide for establishment and supervision of programs for the education and training of employers and employees in the recognition, avoidance and prevention of unsafe or unhealthful working conditions in employment covered by this title." LE § 5-205(d)(1).
A third approach, reflecting an even greater intensity of regulation, would be a licensing requirement — a demand that employees demonstrate their ability to comply with proper workplace practices. Presumably, the choice among these alternatives reflects a complex policy judgment about cost and efficacy. A legislative decision to forgo one means of regulation in favor of another is no less a regulatory decision within the field of workplace safety. Indeed, the legislative debate over regulation of power equipment at construction sites illustrates this point precisely.
In light of all the characteristics of the MOSH Act, we must conclude that the General Assembly's policy judgments in this area are the last word. In short, the State has acted with such force "that an intent by the State to occupy the entire field must be implied . . ." County Council for Montgomery County, 274 Md. at 59.
 III Conclusion
In summary, it is our opinion that State law has preempted the field of occupational safety and health. A local ordinance like Baltimore City Ordinance 787, imposing licensing or other occupational safety requirements for operators of construction equipment, is invalid.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions Advice
 Jean H. Baker Assistant Attorney General
[1] The Commissioner was authorized to adopt a model training program and the means for gathering statistics by April 1, 1991. Employer compliance was required by April 1, 1992. Employers became subject to civil penalties on April 1, 1993. In fact, we are told, no funds have been appropriated to implement this subtitle, nor has the subtitle been enforced.
[2] Preemption can be express, as exemplified in MontgomeryCounty v. Atlantic Guns, Inc., 302 Md. 540, 489 A.2d 1114 (1985), but no provision of LE Title 5 or of Subtitle 5 expressly divests local authority.
[3] This office once expressed doubt that regulatory implementation of a statute was relevant to a preemption analysis. 67 Opinions of the Attorney General 183, 193 n. 7 (1984). Skipper
holds otherwise.
[4] The Supreme Court has recognized that the "[federal] Act precludes any state regulation of an occupational safety or health issue with respect to which a federal standard has been established, unless a state plan has been submitted and approved."See Gade v. National Solid Waste Management Ass'n, 112 S.Ct. 2374
(1994). See 29 U.S.C. § 667(a). Maryland's State plan was approved by the Secretary of Labor in 1973. See38 Fed. Reg. 17834 (July 5, 1973).
[5] These factors are drawn not only from Skipper but also from Allied Vending, 332 Md. at 298-300.
 *Page 50